Julie F. CONNOR, Plaintiff,

v.

CLINTON COUNTY PRISON; Thomas V. Duran, Individually and as Warden of Clinton County prison; Clinton County Prison Board; Clinton County Commissioners; and Miles Kessinger, as Chairman of the Clinton County Prison Board and Member of the Clinton County Commissioners, Defendants.

No. 4:CV–96–0919.

United States District Court,
M.D. Pennsylvania.

May 2, 1997.

Jeffrey C. Dohrmann, Rieders, Travis, Mussina, Humphrey & Harris, Williamsport, PA, for plaintiff.

Hugh J. Hutchison, Leonard Tillery & Sciolla, Philadelphia, PA, for defendants.

### MEMORANDUM

McCLURE, District Judge.

### DISCUSSION:

On May 20, 1996, plaintiff Julie F. Connor initiated this action with the filing of a complaint alleging that defendants violated various constitutional provisions and the Pennsylvania Whistleblower Law by terminating her employment at the Clinton County Prison as a secretary/records clerk.

Before the court is defendants' motion for summary judgment.

### DISCUSSION:

### I. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed.R.Civ.P. 56(c) (emphasis added).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex* at 323, 325, 106 S.Ct. at 2552–2553, 2553–2554.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson* at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988).

## II. MATERIAL FACTS NOT IN GENUINE DISPUTE

1. Plaintiff Julie F. Frazier (formerly and in the caption Julie F. Connor; referred to as "Connor" or "plaintiff" to distinguish plaintiff from her father) is an adult individual who was employed as a secretary/records clerk at the Clinton County Prison commencing in March, 1993.

2. At the time plaintiff's employment began, Arwin Reisch was the warden of the Clinton County Prison.

3. In May, 1994, defendant Thomas Duran succeeded Arwin Reisch as warden of the Clinton County Prison.

4. Miles Kessinger has, at all times material hereto, been a member of the Clinton County Commissioners and the Chairman of the Clinton County Prison Board.

5. At all times material hereto, J.C. Frazier has been the Chief of Police of Lock Haven, Clinton County, Pennsylvania.

6. Frazier is Connor's father.

7. Commencing in February, 1995, Connor began keeping a record of incidents involving or affecting her job at the Clinton County Prison because she felt that her job was in jeopardy. [Plaintiff points out, in addition, that one of the incidents involved a matter of public concern. This legal characterization will be discussed below in the context of her First Amendment Free Speech claim.]

8. The notes, or "log," of incidents and observations was generally kept at her home.

9. In the end of November, 1995, a limited number of pages of the "log" was kept in her desk at work. Those pages consisted of entries commencing October 16, 1995, and ending November 15, 1995.

10. A true and correct copy of the notes kept in Connor's desk in the end of November, 1995, has been identified in discovery as Defendants' Disclosure Documents Nos. 046 through 053, inclusive.

11. The documents identified as Nos. 046–053 were discovered in Connor's desk on November 17, 1995.

12. At the time she applied for employment at the Clinton County Prison, Connor completed and executed an employment application which included a statement in which she acknowledged that she was applying for a position as an "at-will" employee. A true and correct copy of the Application for Employment, including the Applicant's Statement, has been identified in discovery as

Defendants' Disclosure Documents Nos. 003 through 007, inclusive.

13. At no time during the course of her employment did Connor receive a written document modifying her status as an "at will" employee. [Plaintiff disputes this fact based on the Collective Bargaining Agreement between Clinton County and AFSCME, a contention discussed, and rejected, below.]

14. Pursuant to a Nisi Order of Certification dated June 25, 1980, the Pennsylvania Labor Relations Board certified AFSCME District Council 86, AFL–CIO, as the exclusive representative for a bargaining unit composed of "all full-time and regular part-time Jail Guards" at the Clinton County Prison.

15. A true and correct copy of the Nisi Order of Certification (Case No. PERA–R–80–156–C) was identified in discovery as Defendants' Disclosure Documents Nos. 012 through 014, inclusive.

16. No employees other than those belonging to the bargaining unit composed of Jail Guards were recognized or represented by a union at the Clinton County Prison.

17. A collective bargaining agreement was negotiated between Clinton County and Council 86, AFSCME, AFL–CIO, for the benefit of Corrections Officers at the Clinton County Prison. A true and correct copy of the Collective Bargaining Agreement in effect between January 1, 1993, and December 31, 1995, is attached to the complaint and identified as Exhibit A.

18. Connor never was employed in the position of a jail guard or corrections officer at the Clinton County Prison.

19. When Connor's employment was terminated, AFSCME refused to pursue a grievance against the County on her behalf because she was not considered a member of the union.

20. In February, 1995, Duran's girlfriend, Robin McQuire, was arrested for DUI by Lock Haven police officers.

21. Subsequently, Duran asked Connor on more than one occasion whether she had any information concerning his status or that of his girlfriend with respect to any criminal charges that might be lodged against either of them. [Plaintiff asserts that Duran's requests were not limited to questions about the status of the matter. In fact, according to Connor, Duran sought Connor's intervention on his and McQuire's behalf.]

22. Subsequently, Duran asked Connor on more than one occasion for advice as to how he should react to the investigation of the DUI charge and related events. [*See* bracketed recital following ¶ 21 for the additional demands made of plaintiff.]

23. Duran was never arrested or charged with any criminal activity as a result of the matters surrounding the arrest of Robin McQuire for DUI.

24. At no time prior to or subsequent to the termination of her employment did Connor raise any issue before the County Commissioners or the County Prison Board which alleged or suggested that Warden Duran, or any other prison authorities, were involved in wrongdoing or any other misfeasance or malfeasance regarding prison operations.

### III. FACTUAL ISSUES

Connor contends that she was a member of AFSCME and that the Collective Bargaining Agreement between Clinton County and AFSCME applies to her. Specifically, Connor points to a provision of the Collective Bargaining Agreement requiring "just cause" for termination of employment, arguing that the provision would give her a property interest in her employment. We disagree.

Connor cannot seriously argue that her position is covered by the Collective Bargaining Agreement, which covers court-appointed and court-related employees (bargaining units which do not include a secretary/records clerk at Clinton County Prison) and corrections officers (which again does not include Connor's former position). Absent an employment contract or collective bargaining agreement, Connor's position was at-will employment, and she had no property interest in her position.

The parties argue extensively with respect to the issue of Connor's membership in AFSCME. The issue is not material since the Collective Bargaining Agreement did not

cover her position, regardless of union membership. We therefore make no finding as to Connor's membership in AFSCME.

Connor also contends that the parties' conduct indicates that they believed that the Collective Bargaining Agreement applied to her, and that therefore the "just cause" provision should apply. We disagree: the contract either applies or it does not, and in this instance it does not. Connor agreed when hired that changes in the at-will status of her employment were required to be in writing, and may not be implied by the mistaken application of a Collective Bargaining Agreement to which she is not subject.

Finally, Connor in her brief contended that certain factual allegations of the complaint must be deemed admitted because they were not specifically denied in the answer. However, plaintiff's counsel, much to his credit, after reading defendants' reply brief, recognized the error of this contention, and has withdrawn the argument.

### IV. DUE PROCESS CLAIMS

Defendants move for summary judgment with respect to Connor's due process claims, Counts V–VIII of the complaint, based on the fact that the record does not support a finding that Connor had a property interest in continued employment.

■■■ A plaintiff must have a constitutionally protected property interest to support a claim of either procedural or substantive due process. *Midnight Sessions Ltd. v. City of Philadelphia*, 945 F.2d 667, 678 (3d Cir. 1991), *reh'g denied, cert. denied*, 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992). A property interest exists only when there is a legitimate claim of entitlement to the subject of the alleged deprivation. *Shoemaker v. City of Lock Haven*, 906 F.Supp. 230, 233 (M.D.Pa.1995). Since municipal employees in Pennsylvania generally are at-will employees, such a plaintiff must demonstrate an enforceable expectation of continued employment or some form of guarantee of continued employment extended by the municipality/employer. *Id.*

As the above discussion shows, Connor had no claim of entitlement based on the Collec-

tive Bargaining Agreement. No other source of a legitimate expectation of continued employment appears on this record, and so Connor had no property interest. Defendants are entitled to summary judgment as to Counts V–VIII.

### V. FREE SPEECH

■■■ In Counts I and II of the complaint, Connor alleges that defendants violated her right to free speech under the First Amendment to the Constitution of the United States and under Article I, § 7 of the Pennsylvania Constitution.

Defendants note initially that there is a question of whether there has been any "speech" because Connor kept her log secret and did not communicate its contents to anyone. For present purposes, we think that, once Duran found the log and read it, there was communication, albeit not necessarily voluntary. Since the discharge took place after Duran read the log, it can be said that the discharge resulted from the communication. The form of the communication, however, is relevant to the analysis of whether the speech is a matter of public concern, an issue we address below. (There also may be a question of invasion of privacy when one's confidential writings are taken and examined which, since no such claim is before us, we do not address. *But see Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 59 (2d Cir.1987) (no claim for deprivation of constitutional right to privacy in retention and disclosure of portions of a fireman's personal diary)).

Not addressed by the parties is the question of analysis under the Pennsylvania Constitution, which is said to provide greater protection to the exercise of free speech than the federal Constitution, at least as to prior restraints on speech. *Franklin Chalfont Assoc's v. Kalikow*, 392 Pa.Super. 452, 573 A.2d 550, 556 (1990) (citing *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981)). In other contexts, the analysis is the same. *See, e.q., Commonwealth by Preate v. Cancer Fund of America, Inc.*, 153 Pa.Commw. 124, 620 A.2d 647, 649–651 (1993) (reviewing claim under both constitutions that statutes were

content-based regulation of free speech, applying U.S. Supreme Court standards).

In the context of speech by public employees, there does not appear to be a distinction, as the state courts have either applied the federal standard or ruled using the general term "free speech" without designating the source. *See, e.g., Sacks v. Commonwealth, Dept. of Public Welfare,* 502 Pa. 201, 465 A.2d 981 (1983); *McCain v. Commonwealth, Dept. of Education, East Stroudsburg State College,* 71 Pa.Commw. 165, 454 A.2d 667 (1983); *Bovino v. Board of School Directors of Indiana Area School District,* 32 Pa. Commw. 105, 377 A.2d 1284 (1977). We conclude that the same standard of review applies under either constitutional provision.

The Court of Appeals for the Third Circuit recently reviewed the standards applicable to the termination of employment of public employees alleged to have been in retaliation for the exercise of First Amendment rights. *Azzaro v. County of Allegheny,* 110 F.3d 968, 973–977 (3d Cir.1997). The first question is whether the speech at issue is protected by the First Amendment, a question of law for the court to decide. *Id.* at 973 (citing *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995)). If so, we turn to the question of whether there is a genuine issue of material fact as to (1) whether the speech was a motivating factor in the decision to discharge and (2) whether the employee would have been discharged for other reasons absent the speech. *Id.*

In *Azzaro,* the Third Circuit first reviewed the holding of *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), in which a disgruntled assistant district attorney circulated a questionnaire among her peers. The questionnaire sought information about the trustworthiness of certain superiors, morale in the office, and pressure to participate in political campaigns. *Azzaro* at 973–974. Relying on *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court held that a public employee's speech is protected when it (1) addresses a matter of public concern and (2) outweighs the government's interest in the effective and efficient fulfillment of its responsibilities to the public. *Az-*

*zaro* at 974 (citing *Connick* at 147–148, 150, 103 S.Ct. at 1690–1691, 1691–1692). Whether speech addresses a matter of public concern is determined by the content, form, and context of a particular statement. *Id.*

Applying that standard, the Supreme Court found that most of the speech embodied in the questionnaire was unprotected. Specifically, the statements and questions relating to morale and trustworthiness of superiors were not protected because they represented only an effort to gather ammunition for another round of controversy with superiors. However, the speech relating to pressure to participate in political campaigns was protected as a matter of public concern. *Azzaro* at 974.

To clarify what is meant by "public concern" speech, the Third Circuit reviewed the rationale underlying the holding in *Connick.* The First Amendment is intended to assure the unfettered interchange of ideas for bringing about political and social changes desired by the people, and so is the "essence of self-government." *Azzaro* at 974 (quoting *Connick* at 145, 103 S.Ct. at 1689, which in turn quoted *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964)). "It is the value of exchanges of information and ideas relevant to self-governance that entitles public concern speech to 'special protection.'" *Azzaro* at 977. When a public employee is silenced on such a matter, not only is society deprived of "information that may be vital to informed decision-making," the loss may be "particularly serious because public employees, by virtue of their constant interactions with a public office, are often in the best position to know what ails that office." *Azzaro* at 977 (citations omitted).

Given this rationale, the question to be asked is

whether expression of the kind at issue is of value to the process of self-governance. This task does not, of course, involve the court's passing judgment on the merit of the view expressed or its source. Rather, the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place.

*Azzaro* at 977. That is, even statements which may be considered inappropriate or controversial must be protected in order to allow the "uninhibited, robust, and wide-open" exchange of ideas. *Azzaro* at 977 (quoting *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

Other lessons to be derived from *Connick* include: public concern speech may take place in private exchanges between two individuals, since private dissemination of information can be as important as public speeches; the performance of governmental functions is inherently a matter of public concern; and motive, while relevant to an examination of the context of speech, is not determinative as to whether the speech addresses a matter of public concern. *Azzaro* at 975.

In *Azzaro* itself, the speech at issue was comprised of reports by an employee of the Allegheny County Department of Development that she had been sexually harassed by an executive assistant to a County Commissioner. The Third Circuit found this speech to be analogous to reports of racial discrimination, a topic characterized in *Connick* as inherently a matter of public concern. *Azzaro* at 975, 975–976.

Connor appears to concede that most of her notes found by Duran do not implicate matters of public concern. However, she points to one portion of her notes, which reads as follows:

11/15/95  Douglas Mitchell did not go out on work furlough Tues. 10:30 a.m. 14, of Nov. Michael (DW) told me to make out a release on Monday that he spoke to Judge Williamson and he would be faxing us the papers for furlough. I did not make out the release because there was no papers in hand to release him. Upon me leaving, I told the Lt. about his W/R furlough if any thing comes down to get it. Michael ask why I didn't make one out rel. (He asked on Wed. 15, 1995). I told him no paper work. I also told him I would call Williamson & tell him I did not rel. him. No papers. Always told the top man is Duran no decisions or releases unless paperwork. Michael said to me the buck stops here and he pointed to him.

Plaintiff's Exhibit 8 at 000049. ("Michael" is Deputy Warden Michael McLaughlin.) Connor's contention in this regard is that this topic, at least (that is, the potential release of inmates without proper documentation), is a matter of public concern.

The question, then, is whether a private log, kept by a prison clerical employee, in which entries are made about workplace activities, including proper documentation of an inmate's release, is protected because it is speech on a matter of public concern. A search of the WESTLAW database for opinions concerning whether matters discussed in a personal log or diary may constitute matters of public concern returns sparse authority.

In *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54 (2d Cir. 1987), a fireman whose personal diary had been confiscated sued based on retaliation for First Amendment activity. However, the speech at issue consisted of public complaints about such issues as hiring women, *id.* at 55–56, and closed meetings, *id.* at 56, matters clearly of public concern. The retention of the diary, and possible publication of some of its contents, was to be considered evidence of harassment and the retaliatory motive. *Id.* at 59. Donahue therefore is inapposite for present purposes.

*Swineford v. Snyder County Pennsylvania,* 15 F.3d 1258 (3d Cir.1994), involved a remarkably disruptive employee and even more remarkably patient employers. While one of the instances of the plaintiff's conduct was the keeping of "a detailed diary chronicling workplace events," *id.* at 1262, there were many more activities in question. It does not appear, however, that the diary was at issue in the determination of whether the plaintiff's activities were protected under the First Amendment. *Id.* at 1271 (referring only generally to the fact that Swineford alleged electoral malfeasance). Rather, the case hinged on the fact that the defendants were justified in terminating the plaintiff's employment due to the extent of the disruption she caused and the resulting decline in work performance. *Id.* at 1273 ("Swineford's investigation, her notetaking, and, above all, her dogged attempt to obtain criminal prose-

cutions destroyed any proper work relationship with" other persons in her office). Although thorough in its analysis, *Swineford* is not helpful for the limited issue here presented.

However, in *Terrell v. University of Texas System Police*, 792 F.2d 1360 (5th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987), a university policeman was fired for keeping a secret diary in which he made comments critical of his supervisor. The Fifth Circuit did not decide the question of whether the keeping of the diary may be considered "speech" at all, but assumed that it was for purposes of analysis under *Connick. Id.* at 1362. It concluded that the diary was not protected because the plaintiff was speaking as an employee, rather than as a citizen. *Id.* at 1362–1363.

The problem with relying on *Terrell* is that the primary rationale expressed, the "employee" versus "citizen" distinction, was rejected as a primary focus in *Azzaro.* Although the Fifth Circuit relied extensively on language quoted from *Connick*, the same language was given little weight by the Third Circuit. *Azzaro* at 979 n. 5 (language not intended to suggest a critical distinction and interpretation analogous to that of Fifth Circuit inconsistent with holding *of Connick*). Rather, the distinction is another way of expressing the inquiry into the speaker's motivation, which is a factor in the analysis but neither a focus nor outcome-determinative. *Azzaro* at 976–977.

Despite the apparent differences in the recited standard, however, we think that *Terrell* and *Azzaro* may be reconciled by examining the application of the standards to the facts. The Fifth Circuit recited as follows:

> [The plaintiff] made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have had any occasion to do so. The notes in question were made at a time when the Houston Department was already under investigation by the Director of the University System Police. That investigation, which was undertaken without any intervention from outside the government, had already suggested that Terrell himself was a leading cause of seri-

ous problems in the Houston Department. To whatever extent Terrell's notes suggested either that Chief Price had been guilty of mistakes or that Terrell was contemplating revelations that would be embarrassing to his supervisor, such suggestions were a wholly intragovernmental concern at the time Terrell was fired. The conclusion is inescapable: Terrell was not terminated for speaking "as a citizen upon matters of public concern." . . .

*Terrell* at 1362–63 (quoting *Connick*; citation, footnote omitted). Even a cursory review of these factors reflects the Fifth Circuit's reliance on the nature of the issue, i.e. a concern being handled internally, rather than the speaker's motivation. Thus, *Terrell* is consistent with *Azzaro*.

The same principle applies in this case. The concern expressed in Connor's log is that, in one instance, the Deputy Warden wanted her to prepare a work release for an inmate when she did not have proper documentation that the inmate was to be so released. This is not a discussion of a practice or policy of the Clinton County Prison; it is a complaint that Connor feels that she is being blamed for doing something wrong when she only followed the proper procedure. There is no indication that Connor intended to make the issue one for public debate, or was even expressing any opinion as to whether formal documentation of work release requests is proper or necessary. To paraphrase *Connick*: The issue of whether Connor should be disciplined for not preparing a work release for Douglas Mitchell is not a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal. *See Connick* at 149, 103 S.Ct. at 1691.

In reaching this conclusion, however, we expressly reject the argument by defendants that plaintiff's log entry should be interpreted as a misunderstanding of prison policy. Defendants' Reply Brief in Support of Motion for Summary Judgment at 6. As noted, the Third Circuit pointed out in *Azzaro* that the merits of the view expressed are not part of the analysis. *Id.* at 974–975. *See also Terrell* at 1363 (no discussion of merits of the

claims of mistakes by supervisor which plaintiff described in the diary). Thus, whether Connor was correct as to the procedure for work release and whether she was justified in defying the directive of the deputy warden is not material to the question of whether the issue is a matter of public concern.

We conclude that, after reviewing it as to subject matter, form, and context, Connor's speech, presuming it to be such, is not entitled to First Amendment protection. The subject matter was a single instance of the Deputy Warden's wanting a work release prepared when Connor did not have the proper paperwork. The form is a log which was not voluntarily disclosed, so that no communication can be said to have been made until its discovery. The context is a series of incidents at plaintiff's place of employment in which she was not given credit for accomplishments or was unfairly blamed for failures; the entry at issue fit the same pattern.

To this we would add that, even if the speech at issue can be said to be a matter of public concern, it would not outweigh the employer's interest in promoting the efficiency of its services. *See Azzaro* at 977 (reciting balancing test of *Connick* and *Pickering;* other citations omitted). Keeping a secret diary on purported violations by a supervisor leads to mistrust in an office. In the context of a prison, where security concerns and an adversarial relationship with inmates are inherent, mistrust among employees would be a special problem. *Cf. Busby v. City of Orlando,* 931 F.2d 764, 774 (11th Cir.1991) (need for discipline heightened in "quasi-military" organizations such as police departments due to close working relationship); *Donahue* at 58 (same, due to need for "esprit de corps" among firefighters). We simply see no interest on the part of the public or individual prison employees in secret notes which outweighs the governmental interest in orderly correctional facilities.

Defendants' motion for summary judgment will be granted as to plaintiff's free speech claims (Counts I and II).

## VI. FREE ASSOCIATION

■ Defendants move to dismiss Counts III and IV of the complaint, which set forth claims for violation of Connor's right to free association under the First Amendment and Pa. Const. art. I, § 20, respectively. The parties do not indicate any substantive difference in the law as to these sources.

Plaintiff properly points out the long history of cases from the Supreme Court of the United States highlighting the importance of the right of free association, particularly in the context of family relationships. What we fail to see is how the alleged conduct by Duran may have been violative of that right.

Plaintiff alleges that a friend of Duran was arrested by the Lock Haven Police, and that Duran himself may have been subject to arrest due to his misbehavior towards the police during the incident. As a result, Duran badgered Connor to intervene with her father on his and his friend's behalf. Connor refused, saying that there was nothing she could or would do.

Also, there was an incident in which a new employee at the Prison was stopped in his vehicle for allegedly not having valid registration. Since the car was from out-of-state, Duran apparently viewed the situation as one in which only someone who worked in the Prison could have supplied the information to the police, and focused his suspicion on Connor.

Based on these incidents, Connor contends that her right to associate freely with Chief Frazier was violated.

The problem with plaintiff's theory of recovery is that there is no indication that her relationship with her father was adversely affected by defendants' conduct. This is not an instance in which a plaintiff was told to stop associating with someone, or to quit an organization, or lose a government job. What purportedly occurred is that Duran wanted Connor to influence her father, she did not, and Duran terminated her employment. This is an instance of attempting to exploit a relationship, not to interfere with or end it.[1]

---

1. It appears that the claim more properly should be the subject of a claim of wrongful termination

under Pennsylvania law, since the influencing of

The motion for summary judgment will be granted as to plaintiff's free association claims (Counts III and IV).

## VII. WHISTLEBLOWER LAW

■ Defendants move to dismiss plaintiff's claim under the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. §§ 1421 et seq. Defendants contend that violation of the Prison's internal policy requiring paperwork before release of an inmate is not the type of "wrongdoing" to which the Whistleblower Law refers.

The Whistleblower Law provides in part:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 Pa. Stat. Ann. § 1423(a). "Wrongdoing" for these purposes is defined as follows:

A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer.

43 Pa. Stat. Ann. § 1422. An internal Prison policy concerning the need for documentation is not a statute, regulation, ordinance, code of conduct, or code of ethics. The Whistleblower Law simply is inapposite to this situation. Plaintiff's argument that there need be no formal, written enactment is inconsistent with the plain language of the statute.

Connor argues, however, that releasing an inmate without proper paperwork might violate 18 Pa. Cons.Stat. Ann. § 5121(b), which makes it a crime for a person employed in the area of detention to recklessly or knowingly permit an escape. There was no escape in this instance, nor is there a reasonable expectation that an escape might take place. The log kept by Connor does not

police charging decisions could be said to be

indicate that the judge had not ordered work release, only that the paperwork was not in Connor's hand. In fact, the log indicates that Connor offered to explain her refusal to prepare the release to the judge who issued the order.

We also would note that keeping a secret log is not an indication that any report is about to be made. In fact, the secrecy of the log reflects the opposite intention on Connor's part.

The motion for summary judgment will be granted as to Count IX of the complaint.

## VIII. WRONGFUL DISCHARGE

■ Defendants move for summary judgment with respect to Count X of the complaint, which sets forth a claim for wrongful discharge. Plaintiff's brief does not address this aspect of the motion, and so is deemed unopposed. *See* LR 7.6. We therefore review the motion for merit, i.e. construe the facts as alleged by defendants and determine whether they are entitled to judgment based on those facts. *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir.1991); *Anchorage Associates v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 175 (3d Cir.1990).

Defendants point out that plaintiff has not alleged facts which fit one of the "public policy" exceptions to the general rule that an at-will employee may be discharged for "good reason, bad reason, or no reason at all." *Yetter v. Ward Trucking Corp.*, 401 Pa.Super. 467, 585 A.2d 1022, 1025, *allocatur denied*, 529 Pa. 623, 600 A.2d 539 (1991) (table). We agree.

Summary judgment will be granted as to Count X of the complaint.

## IX. CONCLUSION

Plaintiff was an at-will employee with no property interest in her employment, so that her due process claims fail. Presuming the log to be "speech," its contents were not a matter of public concern entitled to protection, so that Connor's free speech claims fail. There was no violation of plaintiff's right to free association, so that her claim of such

against public policy.

452

fails. No "wrongdoing" occurred for purposes of the Pennsylvania Whistleblower Law, and Connor's claim thereunder fails. No clear mandate of public policy under Pennsylvania law was contravened by the termination of Connor's employment.

For these reasons, defendants are entitled to summary judgment on all claims, and the motion therefor will be granted.

An appropriate order will issue.